IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DUSTIN WILLIQUETTE,

                        Plaintiff,                        OPINION AND ORDER

v.

                                                               11-cv-554-wmc

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

                        Defendant.

---

      Pursuant to 42 U.S.C. § 405(g), plaintiff Dustin Williquette seeks judicial review of an adverse decision by the Commissioner of Social Security, which found he was not disabled and therefore not eligible for disability benefits under Title 16 of the Social Security Act. Williquette contends that new evidence requires remand pursuant to the sixth sentence of 42 U.S.C. § 405(g). He also identifies three alleged errors made by the administrative law judge ("ALJ"), which further justify remand pursuant to sentence four of § 405(g), contending that the ALJ: (1) failed to consider Williquette's left eye injury and resulting loss of depth perception; (2) failed to account for his finding of moderate limitations in concentration, persistence and pace in the hypothetical questions posed to the vocational expert; and (3) failed to consider Williquette's inability to sustain work. For the reasons that follow, the court rejects Williquette's challenges to the Commissioner's finding and affirms the decision.

FACTS[1]

## I. Overview of Medical Issues and Social Security Application

On October 16, 2007, Williquette filed a Title XVI application for supplemental security income. (AR 154.) Williquette alleged disability beginning October 9, 2007. (*Id*.) On the application, Williquette listed the following illnesses, injuries, or condition that limit his ability to work: (1) "[ADHD][2] speech and learning disabilities motor skill delays;" (2) "short term memory loss from auto accident in 05 2007;" (3) "vision loss in left eye from bb / gun shot wound in 09 2006;" and (4) "special education classes all his life." (AR 174.)

Williquette's claims were denied initially on December 11, 2007 (AR 82), and upon reconsideration on April 2, 2008 (AR 86). Williquette then requested a hearing before an ALJ (AR 90), which was held via videoconference in front of ALJ Wendy Weber on July 9, 2009 (AR 33, 118). Williquette was represented by an attorney, Don Hermanson. In addition to Williquette, his mother, Deborah Williquette, attended the hearing and testified. The ALJ also heard testimony from Craig C. Rath, Ph.D., P.C., an impartial medical expert, and Kelly Winn, an impartial vocational expert. (AR 33, 143, 146.)

On January 12, 2010, the ALJ issued her decision finding that Williquette has not been under a disability within the meaning of the Social Security Act since October 29,

---

[1] The following facts are drawn from the administrative record, which can be found at dkt. #7.

[2] Williquette actually lists "Addh," but the parties assume that this was meant to be an abbreviation for "ADHD" or "Attention Deficient Hyperactivity Disorder."

2007. (AR 14.) Williquette requested review of the ALJ's decision (AR 10); in a letter dated July 11, 2011, the Appeals Council denied Williquette's that request (AR 1).

Williquette filed the present appeal on August 8, 2011. Williquette is represented by counsel in this action, albeit different counsel than represented him in the administrative proceeding.

**II. Administrative Law Judge Hearing**

Before the ALJ, Williquette testified that he had been employed part-time at a video store from approximately October 2006 to March 2008, but lost his job because he missed too many days. (AR 37-39.)[3] Williquette also testified that he was employed full-time as an assembly line worker from approximately April 2008 to October 2008, but quit that job because he was "getting yelled at a lot for messing up." (AR 39-40.) Williquette testified that the work was "kind of hard to comprehend for me to do . . . [a]nd since I had to do it a[t] a fast -- really fast pace." (AR 40.) In January 2009, Williquette started a new job, also doing assembly line work, but was terminated three months later again for missing too many days. (AR 41.)

Williquette further testified that the only medication he was currently taking was Adderal XR, which "kind of" helps, but also makes him depressed. (AR 42.) Williquette reported that while he was in special education when he was in school, he graduated from high school. (AR 43.) Williquette also testified that he was given additional assistance

---

[3] Williquette later testified that he lost his job at the video store because the store closed. (AR 47.)

in taking tests and in completing homework because he was easily distracted. (AR 49-50.)

When asked why he was having trouble keeping a job, Williquette responded, "It's probably because like I'm not really interested in that. It's not really something that's interesting me and all that, and then like standing for a long period of time. And I kind of lose track at the job when I'm doing it and I try to -- start to zone off." (AR 44.) Williquette testified that he had a hard time concentrating throughout the day; he needed his mother to help determine what he needed to do; he needed help getting jobs; and at the video store a co-worker helped him be successful. (AR 45-46.)

In addition, Williquette briefly testified that he could not see out of his left eye, and that the glasses he was wore were just to protect his eye, not to help with his vision. (AR 53.) Lastly, Williquette testified that he noticed memory loss after his car accident. (AR 56.)

Williquette's mother also testified. Among other things, she testified about Williquette's "typical day," and specifically her involvement in getting him out of bed, instructing him on what to wear, reminding him to brush his teeth and take his medication, preparing his meals, and instructing him when to go to bed. (AR 59-60.) At the age of 20, his mother also testified that he still has a babysitter when she is not present. (AR 65.) In addition, Deborah Williquette testified that the plaintiff never landed a job by himself and that there has always been some co-worker who would watch out for him. (AR 60-61.) She also played an active role in his employment by speaking to Williquette's bosses about his progress. (AR 2.) She further confirmed that he had to

4

have significant help in school and was in special education since he was two years old. (AR 62.)

As for Williquette's problems, his mother testified that he struggles with "[h]is concentration, staying on task, not being able to do the simplest things, [and his] attention span of five minutes." (AR 62.) Williquette's mother also testified that his attention span has been worse since the car accident, and that she noted concerns with his memory.

During the hearing, Dr. Craig Rath testified as a medical expert. Rath noted that the treatment records were about a year old, with the most recent record from 2008. That record indicated that Williquette was medicated, taking Adderall, and doing well. Rath asked Williquette during the hearing if he was still taking Adderall, and Williquette confirmed that he was and had been taking it continuously for the last year. (AR 74.) Rath then testified as to Williquette's impairments: cognitive disorder, causing memory loss, ADHD, other learning disability, and a personality disorder. (AR 75.) Consistent with a psychiatric review dated December 10, 2007, completed by Keith Bauer, Ph.D., Rath further found that Williquette had moderate restrictions in activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in concentration, persistence and pace. (*Id.*) Finally, Rath also identified one or two episodes of decomposition. (*Id.*)

As for job limitations, Rath indicated that Williquette would be limited to simple, repetitive tasks in no more than a moderate stressful environment. (AR 75-76.) Rath reviewed the medical records, noting results of neuropsychological testing, memory

issues, cognitive disorder secondary to closed head trauma, and ADHD. (AR 76-77.) Rath concluded his testimony by opining that the impairments identified in combination or individually did not meet or equal a specific listing in the regulations. On cross-examination by Williquette's counsel, Rath testified that if Williquette's mother's testimony was accepted at face value, Williquette "would be helpless and that would make him marked." (AR 78.)

At the hearing, a vocational expert, Kelly Wynn, also testified. Wynn concluded that a 19-year-old individual with a 12th grade education, difficulties with math, and limited to simple, repetitive, preferably habituated, activities and no more than moderate levels of stress would be able to work as a hand packager, one of Williquette's prior jobs. (AR 76-77.)

### III. Administrative Law Judge's Decision

After describing the five-step sequential evaluation process, the ALJ made certain findings of fact. First, the ALJ found that despite his part-time employment from 2006 to 2008 and two short-term full-time positions, Williquette has not been engaged in substantial gainful employment since October 29, 2007, the application date. (AR 16.) Second, the ALJ found that Williquette has the following severe impairments: (1) cognitive disorder; (2) attention deficit hyperactivity disorder; (3) learning disability; and (4) personality disorder with avoidant, dependent and passive-aggressive traits. (*Id.*)

Critical to Williquette's appeal, the ALJ also found that "[t]he medical evidence does not support the claimant's allegations of disability due to loss of vision in the left eye." (*Id.*) As the ALJ explained in more detail in his decision:

6

> The medical records are conflicting as to whether he is actually blind in that eye. For example, it was reported that he was shot in the left eye with a BB gun in September 2006, which required extraction and surgery, and it was noted that he was not blind in that eye but had a large dilated and deformed pupil. The claimant admitted to decreased vision in the left eye but said that he could see out of that eye. However, it was noted in May 2007, that the claimant was positive for left eye blindness at 90%. Yet, in February 2008, it was noted that his vision in the left eye was 20/50. He had some blurred vision, he wore glasses and there was no driving restriction. Therefore, this is considered a non-severe impairment and does not cause more than minimal limitation in the ability to perform basic work activities.

(AR 16-17 (internal citations to the record omitted).)

At the third step, the ALJ found that Williquette's mental impairments (as listed above) do not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (AR 17.) The ALJ also considered whether the impairments satisfy paragraph B criteria, requiring a mental impairment which results in at least two of the following: marked restrictions of activities of daily living; marked restrictions in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated and extended episodes of decompensation. (*Id.*) The ALJ found moderate restrictions in daily living; mild difficulties in social functioning; moderate difficulties in concentration, persistence and pace; and one or two episodes of decompensation. (*Id.*) Having found no marked limitations and only one or two episodes (but not repeated) episodes of decompensation, the ALJ concluded that the paragraph 2 criteria were not met. (*Id.*) The ALJ also noted that she "translated" these findings into work-related functions in assessing Williquette's residual functional capacity. (*Id.*)

At the fourth step, the ALJ found that Williquette's "medically determinable impairments could reasonably be expected to produce the alleged symptoms but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (AR 18.) In reaching this conclusion, the ALJ provided substantial support and explanation, giving the greatest weight to the opinion of the independent medical expert, Dr. Rath. Rath had concluded that Williquette's impairments did not meet or equal any medical listing, and consistent with the state agency psychiatrist, concluded that Williquette had the same restrictions noted above by the ALJ. The ALJ also pointed to evidence in the record, namely a September 2006 IEP assessment, which while noting a learning disability, found that Williquette: (1) was conscientious about his work and worked hard to complete his assignments; (2) got along well with his peers; (3) attended class regularly; and (4) earned average to above average grades. (AR 19.)

The ALJ also considered Williquette's car crash in May 2007 during which he suffered a closed head injury with questionable loss of consciousness. (AR 19.) The ALJ recounted that a follow-up neurological examination noted that he was alert, responsive and oriented in all spheres. While Williquette scored in the low to average range on certain tests, both Williquette and his mother testified that they were not aware of any trauma-related mental impairment. The examining physician also concluded that Williquette did not suffer memory decline due to the accident, and that his recovery was favorable.

The ALJ further relied on Williquette's own statements in his medical records indicating that he was doing well with use of Adderall for his ADHD. Similarly, the ALJ gave weight to the fact that Williquette *was* able to complete his education and graduate from high school.

While the record confirmed that Williquette lost his job in June 2009, the ALJ also noted that he refused to go on interviews, and refused to follow-up for a recommended psychiatric evaluation and counseling. The ALJ further found Williquette's daily activities to be inconsistent with his complaints of a disabling mental impairment, finding that he is able to drive to school and work, has no problems with daily grooming, though needs some reminding, is able to socialize with his friends, and do household chores, again with reminders. The ALJ also found that he could finish things if they were simple and routine.

Based on Williquette's testimony and that of his mother, the ALJ found that Williquette was not motivated to work and that his mother "does virtually everything for him, including getting him jobs." (AR 20.) The ALJ recounted all of the things Williquette's mother testified that she does for him and stated that while she considered the mother's testimony, she gave greater consideration to the medical records and the medical expert's conclusions.

Moreover, the ALJ explained her reasons for discounting Williquette's treating physician Dr. Juan Lopez, finding that the treating records do not support Lopez's conclusion that the claimant was not capable of supporting himself through gainful employment and that he was permanently incapacitated. (AR 21.) Specifically, the ALJ

9

pointed to Dr. Lopez's notes that Williquette had seen "very good results" in his treatment of ADHD, and that he had responded well and had no side effects from Adderall.  Dr. Lopez also noted no concerns about his social, emotional or behavioral functioning.  He further noted Williquette's normal speech and thought process, with no significant cognitive deficits on neuropsychological testing.  While Dr. Lopez stated that Williquette had some difficulty with immediate and delayed recall, he ultimately concluded that Williquette was a healthy adolescent.

Lastly, the ALJ found Williquette able to perform past relevant work as a hand packager, relying on a vocational expert's description of that work.  (AR 21.)  As such, the ALJ ultimately concluded that Williquette has not been under a disability, as defined in the Social Security Act, since October 29, 2007.  (*Id.*)

## IV.  New Evidence

Approximately six months after the ALJ hearing but before the ALJ issued her opinion, Williquette was assessed by a Dr. Anna Courthron, who found that Williquette presented with "what appears to be borderline intellectual functioning or possibly lower meaning mental retardation."  (AR 566.)  Based on these impairments and a "possible mood disorder," Dr. Courthron referred Williquette for additional testing at Marshfield Clinic by Dr. John Ehrfurth, a neuroscience specialist.  (*Id.*)  Dr. Ehrfurth completed his assessment on January 29, 2010, finding "no suggestion of mental retardation," but finding Williquette in the "low average intellectual capacity" based on a variety of tests.  (AR 570.)  In particular, Ehrfurth found that Williquette's performance on certain tests

"seem fully consistent with the history of attention deficit hyperactivity disorder." (AR 574.)  Dr. Ehrfurth also compared these test results to testing completed in May 2007, indicating that Williquette "improved relative to observations on 05/23/2007," with the exception that "there is no evidence of improvement over this interval on either immediate or delayed recall measures." (AR 575.) "This level of performance is unchanged relative to observations on 05/23/2007." (*Id.*)

As for Williquette's possible brain trauma caused by the 2007 car accident, Dr. Ehrfurth concluded, "I cannot exclude the possibility of trauma related memory impairment, but once again, think it is likely that the patient's ADHD plays a significant role." (*Id.*) Dr. Ehrfurth described Williquette as "floundering" and opined that "the ADHD will require ongoing accommodation," recommending "the services of a job coach on an ongoing basis." (*Id.*)

OPINION

Williquette raises four challenges to the ALJ's decision.  First, he contends that new evidence requires remand pursuant to the sixth sentence of 42 U.S.C. § 405(g). Second, that the ALJ failed to consider Williquette's left eye injury and resulting loss of depth perception.  Third, that remand is warranted because the ALJ failed to account for her finding of moderate limitations in concentration, persistence and pace in the hypothetical questions posed to the vocational expert.  Fourth, Williquette takes issue with the ALJ's failure to consider his inability to sustain work.  The court will address each challenge in-turn.

I.  **Standard of Review**

The standard by which a federal court reviews a final decision by the commissioner is well settled: the commissioner's findings of fact are "conclusive" so long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). When reviewing the commissioner's findings under § 405(g), the court cannot reconsider facts, re-weigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the administrative law judge. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Thus, where conflicting evidence allows reasonable minds to reach different conclusions about a claimant's disability, the responsibility for the decision falls on the commissioner. *Edwards v. Sullivan*, 985 F.2d 334, 336 (7th Cir. 1993).

Nevertheless, the court must conduct a "critical review of the evidence" before affirming the commissioner's decision, *id.*, and the decision cannot stand if it lacks evidentiary support or "is so poorly articulated as to prevent meaningful review." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). When the administrative law judge denies benefits, she must build a logical and accurate bridge from the evidence to her conclusion. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

As for Williquette's argument that remand is warranted under sentence six of § 405(g) because of new evidence, Williquette must show that "there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." Putting aside whether the evidence is "new" and

whether Williquette has demonstrated good cause for failing to submit this evidence earlier, Williquette still must prove that the evidence is material, which means "that there is a 'reasonable probability' that the Commissioner would have reached a different conclusion had the evidence been considered." *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997) (quoting *Sample v. Shalala,* 999 F.2d 1138, 1144 (7th Cir. 1993)) (internal quotation marks omitted).

**II. New Evidence**

As described above, plaintiff must demonstrate that any purported new evidence is (1) actually new, (2) material, and (3) there was good cause in failing to timely submit it. Starting with the last requirement first, Williquette contends that his acknowledged failure to obtain a timely assessment was due to limited availability of psychiatrists in the Eau Claire area and financial constraints. During the hearing Williquette's attorney also noted that "he had been trying to get Mr. Williquette in to see a psychiatrist, but it's very hard to get people in to see psychiatrists in Central Wisconsin, because we don't have many." (AR 36.) Despite this limitation, Attorney Hermanson stated that he'd "just as soon pursue the case and the evidence that we have and then defer any issue on that if we need to -- if you think we need to later. Because I can't be sure that we'll be able to get him in." (*Id.*) The decision to move forward with the hearing, rather than delay pending a neurological assessment may call into question whether claimant had good cause for failing to timely submit it, but the court need not reach this question because, as explained below, the so-called "new evidence" is not material.

While this evidence concerns assessments completed after the hearing and is therefore "new" in that sense, the substance of the assessments -- in particular, the conclusions of Dr. Ehrfurth are not "new" in terms of further developing an understanding of Williquette's mental limitations. To the contrary, the testing is largely consistent with the 2007 testing -- testing Dr. Rath specifically referenced in his review of the medical record -- and Dr. Ehrfurth's conclusion that Williquette's mental issues are largely because of his ADHD is consistent with the prior medical record. Specifically -- and contrary to claimant's position -- the evidence does not support a finding that his 2007 car accident likely contributed to his mental limitations. As such, even if new, the evidence is not material, in that the court does not find a reasonable probability that the Commissioner would have reached a different conclusion if presented with the January 2010 testing.

**III. Consideration of Eye Injury**

Next, claimant argues that the ALJ erred in failing to consider the claimant's eye limitations. (Pl.'s Br. (dkt. #14) 26.) Specifically, claimant takes issue with the ALJ's apparent failure to consider limited peripheral vision in concluding that Williquette could perform the occupation of a hand packager. Plaintiff's argument, however, assumes that Williquette is blind or has limited vision in his left eye, a fact that he did not establish. To the contrary, and as acknowledged by the ALJ, the medical record did not establish any permanent eye injury. An ER report after the BB gun incident, noted that Williquette stated that he could see out of the injured eye, and a treatment note from

February 12, 2008, stated that Williquette's left eye vision was 20/50. Other notes that Williquette is "blind" or "90%" blind in his left eye appear to be conclusory, repeated misstatements, without any medical testing to document such a finding. Accordingly, the court finds no error in the ALJ failing to consider limited peripheral vision since the claimant has failed to establish such an issue in the first instance.

## IV. Accounting for Moderate Limitations in Concentration, Persistence and Pace

Next, Williquette argues that the ALJ erred in not accounting for her finding of moderate limitations in concentration, persistence and pace in her RFC finding and subsequently in the hypothetical questions that she posed to the vocational expert. Specifically, claimant argues that the limitation of "simple, repetitive tasks" does not account for moderate limitations in concentration, persistence and pace. (Pl.'s Br. (dkt. #14) (citing *Young v. Barnhart*, 362 F.3d 995, 1003-04 (7th Cir. 2004); *Steward v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009)).)

Here, the ALJ adopted the opinion of Dr. Rath, who concluded that despite moderate limitations in concentration, persistence and pace, Williquette could perform "simple, repetitive tasks, that were preferably habituated, in no more than a moderately stressful environment." (AR 71-72.) As such, the ALJ's adoption of Rath's opinion adequately connected her finding of moderate limitations in concentration, persistence and pace to the limitation to simple, repetitive tasks provided in her RFC findings. That connection, coupled with the VE being present during Dr. Rath's review of the medical record and hearing his conclusion that Williquette suffered from moderate limitations in

15

concentration, persistence and place but still could perform simple, repetitive tasks, is sufficient to ensure that the VE was apprised of that finding in concluding that Williquette could perform his past job as a hand packager. *See O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010) (approving finding of "VE's familiarity with claimant's limitations" where the VE "heard testimony directly addressing those limitations").[4]

## V. Consideration of Inability to Sustain Work

Finally, Williquette contends that the ALJ erred in failing to account for his inability to work on a "sustained basis." (Pl.'s Br. (dkt. #14) 39.) This challenge is too vague to warrant much consideration, though as the Commissioner points out in his opposition brief, the ALJ did consider plaintiff's checkered work history and need for special assistance or accommodations in rendering her opinion, and specifically noted Williquette's lack of motivation -- which Williquette himself testified to at the hearing. The court can find no error in the ALJ's consideration of Williquette's past work history in determining him to be not disabled under the Act.

---

[4] Moreover, the ALJ's exchange with the VE here did not involve "increasingly restrictive hypotheticals." *See O'Connor-Spinner*, 627 F.3d at 619.

ORDER

IT IS ORDERED that the decision of defendant Carolyn W. Colvin, Acting Commissioner of Social Security, denying plaintiff Dustin Williquette's application for supplemental security income benefits is AFFIRMED.

Entered this 11th day of August, 2014.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge